**Patricia CLARK, et al., Plaintiffs,**

**v.**

**Estelle B. RICHMAN,[1] in her official capacity as Secretary of Public Welfare of the Commonwealth of Pennsylvania, Defendant.**

**No. 4:00–CV–1306.**

United States District Court,
M.D. Pennsylvania.

Oct. 7, 2004.

---

1. Substitution made pursuant to Federal Rule of Civil Procedure 25(d)(1).

Carol A. Horowitz, Ilene W. Shane, Disabilities Law Project, Pittsburgh, PA, Edmond A. Tiryak, Wayne, PA, Mark J. Mur-

phy, Disabilities Law Project, Philadelphia, PA, for Plaintiffs.

Michael L. Harvey, Harrisburg, PA, Rodney M. Torbic, Pittsburgh, PA, for Defendant.

## MEMORANDUM

MCCLURE, District Judge.

### BACKGROUND:

This action is brought on behalf of a class of disabled individuals who receive Medical Assistance (MA) benefits. Plaintiffs, by and through their next friends, allege that they have been denied access to dental services due to the policies of defendant, the Secretary of the Pennsylvania Department of Public Welfare (DPW), and seek enforcement of certain provisions of Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–1396v (Title XIX, or the Medicaid Act).

Specifically, plaintiffs allege that DPW violated 42 U.S.C. § 1396a(a)(10)(A) by not providing them with medically necessary dental services (Count I). They allege that DPW violated 42 U.S.C. § 1396a(a)(8) and 42 C.F.R. § 435.930(a) by failing to provide dental services to plaintiffs and class members with reasonable promptness (Count II). Plaintiffs had alleged a claim based on comparability of services (Count III), but have indicated that they will not pursue that claim, (see Pls.' Mot. Summ. J., Rec. Doc. No. 70; Pls.' Br. Supp. Mot. Summ. J., Rec. Doc. No. 71, at 2 n. 2), so Count III will be dismissed.

Plaintiffs also allege that DPW violated 42 U.S.C. § 1396a(a)(30)(A) by failing to take necessary steps, such as adequate reimbursement rates, to ensure equal access to dental services for MA recipients (Count IV). Finally, plaintiffs allege that DPW violated 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43), 1396d(a)(xiii)(4)(B), and 1396d(r) by not en-

suring that children under the age of 21 timely receive early and periodic screening, diagnostic and treatment (EPSDT) services in the form of dental care.

Following extensive discovery, plaintiffs filed a motion for partial summary judgment on issues of liability. Shortly thereafter, DPW cross-filed a motion for summary judgment. Plaintiffs then filed a motion to strike portions of defense expert Catherine Sreckovich's report.

DPW preliminarily argues that Title XIX does not confer on plaintiffs any privately enforceable rights. DPW previously raised this same argument before a district court sitting in the Eastern District of Pennsylvania. That court agreed with DPW and dismissed an action similar to the one before this court. See Sabree ex rel. Sabree v. Houston, 245 F.Supp.2d 653 (E.D.Pa.2003) (Sabree I). Given that Sabree I was on appeal while the parties were briefing their motions in this case, plaintiffs suggested, and DPW concurred, that this case should be held in abeyance so that this court could proceed with guidance from the United States Court of Appeals for the Third Circuit.

On May 11, 2004, the Third Circuit reversed the Sabree I court's dismissal and held that Title XIX provides certain individuals with privately enforceable rights. See Sabree ex rel. Sabree v. Richman, 367 F.3d 180, 193–94 (3d Cir.2004) (Sabree II). Now, guided by Sabree II, and for the following reasons, this court will deny plaintiffs' motion for partial summary judgment and grant in part and deny in part DPW's motion for summary judgment. The court will also deny plaintiffs' motion to strike portions of defense expert Catherine Sreckovich's report.

### DISCUSSION:

#### I. The Summary Judgment Motions

Both parties move for summary judgment. We analyze the parties' motions contemporaneously.

## A. The Summary Judgment Standard

Summary judgment is appropriate if there are no genuine issues of material fact in dispute and if the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beers–Capitol v. Whetzel,* 256 F.3d 120, 130 n. 6 (3d Cir.2001).

An issue is "genuine" if a reasonable jury could find for either party. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. "Material" facts are those that might affect the outcome of the case. *Id.* at 248, 106 S.Ct. 2505.

Initially, the moving party bears the burden of stating the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. "It can discharge that burden by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548.

Once the moving party points to evidence demonstrating that no genuine issue of material fact exists, the nonmoving party has the duty to set forth specific facts showing that a genuine issue of material fact does exist and that a reasonable factfinder could rule in its favor. *Ridgewood Bd. of Educ. v. N.E, ex rel. M.E.,* 172 F.3d 238, 252 (3d Cir.1999) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Although "[s]peculation and conclusory allegations do not satisfy this duty," *Ridgewood,* 172 F.3d at 252 (citing *Groman v. Township of Manalapan,* 47 F.3d 628, 637 (3d Cir.1995)), all inferences are made in a light most favorable to the nonmoving party. *See Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Marino v. Indus. Crating Co.,* 358 F.3d 241, 247 (3d Cir. 2004).

## B. Statement of Relevant Facts

We briefly recount the relevant, material facts of the case as drawn from the parties' statements of undisputed facts, required by Local Rule 56.1.

Original named plaintiffs included Patricia Clark, Sarah Carrasquillo, and K.S. Plaintiff Patricia Clark (suing by and through her next friend, Connie Clark), is an adult with Down Syndrome and mental retardation. Plaintiff Sarah Carrasquillo (suing by and through her next friend, Nilda Figueroa), is an adult with autism, mental retardation, and a cleft palate. Plaintiff K.S. (suing by and through her next friend, Priscilla Conrad), is a child with Down Syndrome and mental retardation. All three are eligible for Medical Assistance (MA) benefits because they have SSI-level disabilities. All three plaintiffs receive MA benefits through either the Commonwealth of Pennsylvania's fee-for-service or managed care provider systems.

Defendant, Estelle B. Richman, is the Secretary of the Pennsylvania Department of Public Welfare (DPW), a single state agency designated by the Commonwealth to take responsibility for the State Medical Assistance Plan (SMAP), otherwise known in Pennsylvania as the Medical Assistance program (MA program).

On November 1, 2002, this court certified the case as a class action, consisting of two sub-classes:

Class A: All recipients of Medical Assistance benefits under the age of 21 who are eligible because they have disabilities that meet the disability criteria

under the Supplemental Security Income (SSI) program.

Class B: All categorically needy adult recipients of Medical Assistance benefits who are eligible because they have disabilities that meet the disability criteria under the Supplemental Security Income (SSI) program.

(*See* Mem. & Order dated Nov. 1, 2002, Rec. Doc. No. 55.)

Pennsylvania's MA program was initially established as a fee-for-service program that permitted MA recipients to seek services directly from any provider enrolled in the MA program. In 1997, Pennsylvania was granted a waiver by the federal Centers for Medicare and Medicaid Services to allow certain MA recipients in 25 out of 67 counties in the Commonwealth to receive services through managed care organizations instead of through the fee-for-service system.

Pennsylvania is one of eight states to include in its SMAP certain optional dental benefits for eligible adults of the age of 21 or over. Certain individuals under the age of 21 are eligible for all medically necessary dental services. They are also eligible for early and periodic screening, diagnosis, and treatment (EPSDT) services, administered by Automated Health Systems (AHS) on behalf of DPW.

For fiscal years 1999–2002, the Commonwealth filed Program Revision Requests (PRRs), through which the Commonwealth requested increased funding for particular programs, including allotments to increase dental reimbursement rates. The PRRs included certain information regarding dental care and services for MA recipients in Pennsylvania. The PRRs were eventually approved and implemented.

Based on numbers from a Dental Summit in 2001, roughly 8,031 dentists are licensed to practice in Pennsylvania. About 72% of the total licensed dentists, or 5,764, are enrolled in the MA program. A lesser number of enrolled dentists actually participate in the MA program, i.e., actually accept MA patients. Participating dentists, of course, are free to limit the number of MA patients they treat.

At this point, the parties' general factual agreement ends. Plaintiffs contend at length that the Commonwealth is experiencing a dramatic shortage of dentists statewide who are able or willing to treat MA recipients. Plaintiffs argue that the ratio of dentists to MA recipients is grossly disproportionate to the ratio of dentists willing and able to treat other, non-MA, patients. Plaintiffs further claim that a multitude of factors and data, such as low reimbursement rates, outdated lists of enrolled dentists, failed attempts to integrate managed care as an alternative to fee-for-service programs, and other inadequate measures to assure that class members receive dental care, all contribute to the lack of adequate dental care and services for themselves and class members.

DPW disputes plaintiffs' interpretation of various data and counters that much of the data plaintiffs rely on do not reveal that MA recipients are not receiving dental services. DPW asserts the data plaintiffs rely on do not show a disparity of services available to MA recipients and the general population in discrete geographical areas. DPW also argues that the data do not indicate whether class members have actually sought and have been denied or delayed dental services, and that the data do not accurately portray the Commonwealth's current scheme of utilizing both managed care and fee-for-service systems. Finally, DPW claims that the Commonwealth has continuously attempted to improve the quality and availability of dental services for MA recipients and that the

Commonwealth is in compliance with the Title XIX provisions at issue.

### C. Does Title XIX Provide Private Rights Enforceable Through § 1983?

Title XIX of the Social Security Act, codified at 42 U.S.C. §§ 1396–1396v, established a "cooperative federal-state program under which the federal government furnishes funding to states for the purpose of providing medical assistance to eligible low-income persons." *Pa. Pharm. Ass'n v. Houstoun,* 283 F.3d 531, 533 (3d Cir.2002) (en banc) (*PPA*). States are not obliged to participate under Title XIX, but if they do, they "must comply with the Medicaid Act and with regulations promulgated by the Secretary of Health and Human Services (HHS)." *PPA,* 283 F.3d at 533 (citing *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 502, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990)). Participating states must devise and implement a State Medical Assistance Plan (SMAP) that is approved by the Secretary of HHS. *See* 42 U.S.C. § 1396; 42 C.F.R. § 430.10. Pennsylvania participates under Title XIX through its plan, the Medical Assistance (MA) program. Given the Commonwealth's participation, Pennsylvania is required to pay all or part of the costs for certain care and services, and may also pay for all or part of additional services if it elects to do so under certain optional provisions of Title XIX. *See* 42 U.S.C. § 1396a(a)(10)(A); 42 C.F.R. § 440.210.

▇ Plaintiffs seek to vindicate alleged rights under Title XIX through 42 U.S.C. § 1983. Section 1983, of course, "imposes civil liability upon any person who, under color of state law, deprives another person of any rights, privileges, or immunities secured by the Constitution or laws of the

United States." *S.G. ex rel. A.G. v. Sayreville Bd. of Educ.,* 333 F.3d 417, 420 (3d Cir.2003); *see* 42 U.S.C. § 1983. Thus, § 1983 does not create any new substantive rights, but rather provides a remedy for the violation of a federal constitutional or statutory right. *Kopec v. Tate,* 361 F.3d 772, 775–76 (3d Cir.2004); *Gruenke v. Seip,* 225 F.3d 290, 298 (3d Cir.2000).

DPW argues that plaintiffs' claims fail because plaintiffs have no private enforceable rights under Title XIX. DPW heavily relies on *Sabree I,* a case in which a district court held that Congress had not unambiguously conferred rights to MA recipients under Title XIX which were vindicable through § 1983. 245 F.Supp.2d at 659. That district court, however, was reversed in *Sabree II.* Significantly, *Sabree II* specifically held that 42 U.S.C. §§ 1396a(a)(8), 1396a(a)(10), and 1396d(a)(xiii)(15), unambiguously confer upon MA recipients private rights vindicable through § 1983. Three of plaintiffs' four remaining counts [2] rest in whole or in part on § 1396a(a)(8) and § 1396a(a)(10), so we therefore turn to analyze whether plaintiffs have private rights under Title XIX in the wake of *Sabree II.*

In *Sabree II,* the Third Circuit engaged in a thorough analysis to determine whether certain provisions of Title XIX were enforceable under § 1983. The *Sabre II* court looked to the recent Supreme Court decision, *Gonzaga University v. Doe,* 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002), for guidance. In *Gonzaga University,* the Supreme Court set out a three-part test for courts to employ when deciding whether a federal statute confers enforceable private rights: (1) what are the essential characteristics of an "unambiguously conferred right"; (2) does the statutory language of Title XIX impart an "unambiguously conferred right"; and (3) if

---

**2.** We reiterate that plaintiffs no longer wish to pursue their Count III, so it will be dismissed.

an individual right has been unambiguously conferred, has Congress precluded individual enforcement of that right? *Sabree II,* 367 F.3d at 183 (referencing *Gonzaga University*).

The *Sabree II* court first canvassed prior Supreme Court precedent to define the essential characteristics of unambiguously conferred rights, noting, among other things, the importance of clear language imposing a binding obligation on the states for the benefit of an identifiable class of individuals. *Sabree II,* 367 F.3d at 184–89 (discussing, inter alia, *Blessing v. Freestone,* 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997); *Suter v. Artist M.,* 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992); *Wilder,* 496 U.S. 498, 110 S.Ct. 2510; *Wright v. Roanoke Redevelopment & Housing Auth.,* 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987)). The *Sabree II* court then analyzed the text and structure of § 1396a, the Title XIX provision at issue, and found that § 1396a clearly speaks in mandatory rather than precatory terms. 367 F.3d at 189–90. Based on the text and structure of § 1396a, the *Sabree II* court determined that certain subsections of § 1396a created enforceable private rights, notwithstanding generalized appropriations and introductory language found at the beginning of § 1396a. 367 F.3d at 190–93.

Finally, the *Sabree II* court found that "Title XIX contains no provision explicitly precluding individual actions." 367 F.3d at 193. Thus, the *Sabree II* court concluded that "Congress clearly and unambiguously conferred the rights of which plaintiffs have allegedly been deprived by Pennsylvania, and has not precluded individual enforcement of those rights." 367 F.3d at 194.

With *Sabree II* in mind, we now turn to decide whether the provisions of Title XIX at issue in this case afford plaintiffs privately enforceable rights.

### 1. Plaintiffs' Counts I & II

■ Plaintiffs' Count I rests on § 1396a(a)(10)(A), which requires the Commonwealth's MA program to "provide ...for making medical assistance available" to all eligible individuals, *see* 42 U.S.C. § 1396a(a)(10)(A), including certain dental services. *See* 42 U.S.C. §§ 1396d(a)(xiii)(5)(B), 1396d(a)(xiii)(10). Plaintiffs' Count II rests on § 1396a(a)(8), which requires MA to be furnished with reasonable promptness to all eligible individuals. *See* 42 U.S.C. § 1396a(a)(8) ("the reasonable promptness" provision).

The Third Circuit specifically held in *Sabree II* that both § 1396a(a)(10)(A) and § 1396a(a)(8) afford individuals enforceable rights vindicable through § 1983. 367 F.3d at 183. We will therefore deny DPW's motion to the extent DPW argues that these provisions are not enforceable by private individuals.

### 2. Plaintiffs' Count IV

■ Plaintiffs base their Count IV on § 1396a(a)(30)(A) (the "equal access" provision), which mandates that the Commonwealth must assure that payments for care and services are "consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area[.]" 42 U.S.C. § 1396a(a)(30)(A).

The *Sabree II* court did not address the equal access provision, so we must determine whether this provision affords individuals with enforceable rights. The Third Circuit did consider the equal access provision in *PPA,* a case that pre-dated *Gonzaga University.* In *PPA,* the Third Circuit

ruled that pharmacists, as MA service providers, could not assert a § 1983 claim based on the equal access provision because Congress never intended to permit benefit providers with enforceable rights under § 1396a(a)(30)(A). 283 F.3d at 541–43. Yet in dicta extremely pertinent to the matter at hand, the Third Circuit opined that "Medicaid recipients plainly satisfy the intended-to-benefit requirement and are thus potential private plaintiffs." *PPA,* 283 F.3d at 544. The Third Circuit also recognized that the Supreme Court has remarked on multiple occasions that the equal access provision was drafted with MA recipients, not service providers, in mind as intended beneficiaries under Title XIX. *See PPA,* 283 F.3d at 538 (citing *Cannon v. Univ. of Chicago,* 441 U.S. 677, 691, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), and *Wilder,* 496 U.S. at 510, 110 S.Ct. 2510, respectively).

A survey of circuit court opinions reveals that some circuit courts have either permitted MA recipients to allege claims under the equal access provision, or have only held that MA service providers, as opposed to MA recipients, cannot vindicate any rights under the equal access provision through § 1983. *See, e.g., Evergreen Presbyterian Ministries, Inc. v. Hood,* 235 F.3d 908, 927 (5th Cir.2000); *Visiting Nurse Ass'n of N. Shore, Inc. v. Bullen,* 93 F.3d 997, 1004 (1st Cir.1996); *Arkansas Med. Soc'y, Inc. v. Reynolds,* 6 F.3d 519, 526 (8th Cir.1993); *see also PPA,* 283 F.3d at 544; *Methodist Hosps., Inc. v. Sullivan,* 91 F.3d 1026, 1029 (7th Cir.1996). A growing number of district courts have explicitly held that the equal access provision affords MA recipients with enforceable private rights. *See, e.g., Memisovski ex rel. Memisovski v. Maram,* No. 92 C 1982, 2004 WL 1878332, at *5–8 (N.D.Ill. Aug.23, 2004); *Clayworth v. Bonta,* 295 F.Supp.2d 1110 (E.D.Cal.2003); *Ass'n of Residential Res. in Minnesota v. Minnesota Comm'r*

*of Human Servs.,* No. Civ. 03–2438 (JRT/FLN), 2003 WL 22037719 (D.Minn. Aug.29, 2003); *American Soc'y of Consultant Pharmacists v. Concannon,* 214 F.Supp.2d 23 (D.Me.2002). *But see Sanchez v. Johnson,* 301 F.Supp.2d 1060 (N.D.Cal.2004).

The recent *Memisovski* decision is particularly persuasive. The *Memisovski* decision involved a class represented by a group of plaintiffs who alleged, through § 1983, that Illinois violated the equal access and EPSDT services provisions of Title XIX. The *Memisovski* court engaged in an extensive *Gonzaga University*-analysis and determined that those provisions do provide MA recipients with vindicable private rights. 2004 WL 1878332, at *5–12.

The *Memisovski* court presented a number of forceful arguments for the existence of enforceable rights under the equal access provision, all of which we embrace. We observe, as the *Memisovski* court observed, that 42 U.S.C. § 1320a–2 provides that "an action may be brought to enforce another provision of this chapter," such as the equal access provision, and that "such provision is not deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan." 42 U.S.C. § 1320a–2. Further, the equal access provision is couched in mandatory language which, when combined with the absence of an administrative mechanism to enforce that language, connotes an intent to permit private enforcement of the provision. *See Memisovski,* 2004 WL 1878332, at *7; *Clayworth,* 295 F.Supp.2d at 1123; *see also Sabree II,* 367 F.3d at 190 (explaining significance of mandatory language). Title XIX's legislative history likewise supports the notion that the equal access provision provides for private actions. *See Memisovski,* 2004 WL 1878332,

at \*7 n. 7 (summarizing legislative history). Moreover, as observed in *Sabree II,* the Supreme Court found in *Wilder,* 496 U.S. at 502–04, 110 S.Ct. at 2514, that a nearly identical Title XIX provision created private rights enforceable through § 1983, and the Supreme Court has made clear that *Wilder* is still good law. *See Gonzaga University,* 536 U.S. at 280, 122 S.Ct. 2268; *Sabree II,* 367 F.3d at 192.

These reasons, as well as others recounted in *Memisovski,* adequately demonstrate that § 1396a(a)(30)(A) unambiguously confers private rights which are vindicable through § 1983. We will therefore deny DPW's motion to the extent it argues to the contrary.

### 3. Plaintiffs' Count V

Plaintiffs' Count V rests on § 1396a(a)(10)(A), to the extent that section requires medical assistance to be made available to eligible individuals under 21 years of age in the form of early and periodical screening, diagnostic, and treatment (EPSDT) services. *See* 42 U.S.C. § 1396d(a)(xiii)(4)(B) (listing EPSDT services among services covered by MA). Count V also rests on § 1396a(a)(43), which requires the Commonwealth's MA program to feature means of ensuring that eligible individuals under the age of 21 are informed of and provided EPSDT services, including certain dental services. *See* 42 U.S.C. § 1396a(a)(43)(A)-(C); *see also* 42 U.S.C. § 1396d(r)(1) & (3) (defining EPSDT screening and dental services). The Commonwealth's MA program must also provide for the actual provision of EPSDT services in a timely fashion. *See* 42 U.S.C. § 1396a(43)(B)-(C); 42 C.F.R. § 441.56(e).

Plaintiffs's Count V remains viable to the extent it rests on the medical assistance provision, § 1396a(a)(10)(A), for the reasons set forth in *Sabree II* and the reasons discussed *supra* Parts I.C & I.C.1. Indeed, as plaintiffs point out, the sole difference between their Count V and the claims in *Sabree II* is the type of services at issue. *Sabree II* involved ICF/MR services, which are among the services covered by MA, *see* 42 U.S.C. § 1396d(a)(xiii)(15), while this case involves dental care and EPDST services, which as already mentioned, are also among the services covered by MA. *See* 42 U.S.C. §§ 1396d(a)(xiii)(4)(B), 1396d(a)(xiii)(5)(B), 1396d(a)(xiii)(10).

The *Sabree II* court, though, was not faced with whether § 1396a(a)(43) affords MA recipients enforceable rights. We find that § 1396a(a)(43) affords plaintiffs vindicable private rights. Section 1396a(a)(43) speaks in mandatory terms, as it mandates that a state plan "must" provide for informing eligible individuals of EPSDT services, as well as mandates that a state plan "must" provide or arrange for the provision of EPSDT services. *See* 42 U.S.C. § 1396a(a)(43)(A)-(C). Additionally, § 1320a–2 discounts any argument that § 1396a(a)(43), simply by appearing in a section regarding plan requirements, cannot give rise to an enforceable right. *See* 42 U.S.C. § 1320a–2. Our finding is in line with a substantial collection of post-*Gonzaga University* rulings from other courts. *See, e.g., Memisovski,* 2004 WL 1878332, at \*8–11; *Kenny A. ex rel. Winn v. Perdue,* 218 F.R.D. 277, 293–94 (N.D.Ga. 2003); *Collins v. Hamilton,* 231 F.Supp.2d 840, 846–47 (S.D.Ind.2002); *S.D. v. Hood,* No. Civ. A. 02–2164, 2002 WL 31741240, at \*4–6 (E.D.La. Dec.5, 2002). *But see Charlie H. v. Whitman,* 83 F.Supp.2d 476, 497–99 (D.N.J.2000) (ruling prior to *Gonzaga University* that EDPST provisions were not privately enforceable). Accordingly, we will deny DPW's motion to the extent that it claims that no private rights arise under the EPSDT provisions.

### D. Evaluating the Merits of Plaintiffs' Claims

Having determined that all of plaintiffs' claims rest on private rights vindicable through § 1983, we now analyze whether summary judgment is appropriate for either party on plaintiffs' Counts I, II, IV, and V.

### 1. Count I, Alleged Violation of 42 U.S.C. § 1396a(10)(a)

Section 1396a(a)(10)(A) requires the Commonwealth's MA program to provide for making "medical assistance" available to all eligible individuals, *see* 42 U.S.C. § 1396a(a)(10)(A), in the form of payment for certain medical and surgical services furnished by dentists. *See, e.g.,* 42 U.S.C. §§ 1396d(a)(xiii)(5)(B), 1396d(a)(xiii)(10).

DPW argues that § 1396a(a)(10)(A) requires the Commonwealth to pay some or all of the costs of certain dental services available to eligible individuals, but does not require the Commonwealth to provide the services directly. Plaintiffs, on the other hand, contend that § 1396a(a)(10)(A) mandates the actual provision of, or arrangement for, certain dental services.

A plain reading of § 1396a(a)(10)(A) supports DPW's interpretation of the provision. Section § 1396a(a)(10)(A) requires the Commonwealth to make "medical assistance" available to eligible individuals. "Medical assistance" means *"payment* of part or all of the cost of [the enumerated types of] care and services." 42 U.S.C. § 1396d(a) (emphasis added).

Section 1396a(a)(10)(A) arguably speaks of more than payment, though, as it requires the Commonwealth, through its MA program, to "provide-for making medical assistance available, *including at least the care and services* listed in paragraphs (1) through (5), (17) and (21) of section

1396d(a)" available to eligible individuals. 42 U.S.C. § 1396a(a)(10)(A) (emphasis added). Obviously, the issue is whether the "including at least the care and services …." language of § 1396a(a)(10)(A) expands the definition of "medical assistance" beyond simply payment for services to include actual provision of services.

We do not believe § 1396a(a)(10)(A) imposes an obligation on the Commonwealth to provide any services directly. The most reasonable interpretation of § 1396a(a)(10)(A) is that medical assistance, i.e., financial assistance, must be provided for *at least* the care and services listed in paragraphs (1) through (5), (17) and (21) of section 1396d(a). To read the provision any other way would mean that the definition of medical assistance would be expanded, for purposes of § 1396a(a)(10)(A) only, beyond mere financial assistance and would oblige states to directly provide services as well, which would run contrary to the entire scheme envisioned under Title XIX.

The *Sabree II* court took note of § 1396a(a)(10)(A)'s peculiar language, but specifically stated that the very issue was not before them. 367 F.3d at 181 n. 1. The *Sabree II* court did, however, reference the Seventh Circuit's decision in *Bruggeman ex rel. Bruggeman v. Blagojevich,* 324 F.3d 906 (7th Cir.2003). In *Bruggeman,* the Seventh Circuit, per Judge Posner, ruled that developmentally disabled individuals had standing to allege violations of Title XIX, the Rehabilitation Act, and the ADA. The *Bruggeman* court concluded that such individuals had standing to allege violations of the Title XIX, but could not state a claim for medical *services* based on the reasonable promptness provision, the provision relied on by plaintiffs in their Count II. The Seventh Circuit stated:

The statutory entitlement to reasonable promptness of medical services (42

U.S.C. § 1396a(a)(8)) is not infringed by the maldistribution (as it seems to the plaintiffs) of [certain services] across the state. It is not as if the plaintiffs require relocation to such a facility on an emergency basis, in which event the remoteness of any such facility from their homes, where they are living at present, would deprive them of prompt treatment. Even if they did require emergency treatment, their theory of violation would be a considerable stretch because *the statutory reference to "assistance" appears to have reference to financial assistance rather than to actual medical services,* though the distinction was missed in *Bryson v. Shumway,* 308 F.3d 79, 81, 88–89 (1st Cir. 2002), and *Doe v. Chiles,* 136 F.3d 709, 714, 717 (11th Cir.1998). *Medicaid is a payment scheme, not a scheme for state-provided medical assistance, as through state-owned hospitals.* The regulations that implement the provision indicate that what is required is a prompt determination of eligibility and prompt provision of funds to eligible individuals to enable them to obtain the covered medical services that they need, *see* 42 C.F.R. §§ 435.911(a), .930(a)-(b); a requirement of prompt treatment would amount to a direct regulation of medical services.

*Bruggeman,* 324 F.3d at 910 (emphasis added); *see Rite Aid of Pa., Inc. v. Houstoun,* 171 F.3d 842, 845 (3d Cir.1999) ("The Medicaid Act requires states to pay for certain services . . . ."). The *Bruggeman* decision squarely supports this court's interpretation of "medical assistance." That is, the medical assistance that must be provided under § 1396a(a)(10)(A) is financial in nature. As a result, § 1396a(a)(10)(A) does not impose an obligation on the Commonwealth to provide the services that plaintiffs seek. Accordingly, plaintiffs' Count I fails as a matter

of law because § 1396a(a)(10)(A) does not oblige the Commonwealth to provide directly the medical services plaintiffs seek.

We briefly pause to distinguish *Sanders ex rel. Rayl v. Kansas Dep't of Soc. & Rehab., Servs.,* 317 F.Supp.2d 1233 (D.Kan.2004). The *Sanders* court applied the test espoused in *Gonzaga University* and held, inter alia, that § 1396a(a)(17) (requiring that a state provide reasonable standards for determining eligibility for medical assistance) and § 1396a(a)(8) (the reasonable promptness provision), do not afford individuals enforceable rights. The *Sanders* court also cited *Bruggeman* in support of its ruling.

We believe that the *Sanders* court wrongly suggests that the statutory language speaking to a state's duty to furnish MA with reasonable promptness "does not contain the explicit rights-creating language described in *Gonzaga." Sanders,* 317 F.Supp.2d at 1250. In this regard, we believe that the *Sanders* court misapprehended both the Supreme Court's *Gonzaga University* decision and the Seventh Circuit's *Bruggeman* decision. The *Bruggeman* court did not foreclose all private causes of action based on the Title XIX provisions at issue, but merely foreclosed any private cause of action based on the allegedly untimely provision of services. As noted, the statutory sections require the provision of medical assistance, i.e., financial assistance, not direct services.

Theoretically, eligible individuals could assert a cause of action under certain Medicaid provisions if, e.g., they were not receiving medical assistance *to pay* all or part of the *cost* of medical services. *See* 42 U.S.C. § 1396d(a). Such a claim would be distinct from a claim for actual services. Simply because a claim for services is not actionable under certain Medicaid provisions does not mean that all claims are not

actionable, and *Bruggeman* does not sanction such a rationale. We therefore conclude that although certain causes of action, such as for financial assistance for services, may be actionable under § 1396a(a)(10)(A), plaintiffs do not present such a claim. Accordingly, we will grant summary judgment for DPW as to plaintiffs' Count I.

### 2. Count II, Alleged Violation of 42 U.S.C. § 1396a(a)(8)

■ Section 1396a(a)(8), the reasonable promptness provision, requires medical assistance to be furnished in a timely fashion to all eligible individuals. *See* 42 U.S.C. § 1396a(a)(8). Plaintiffs assert that DPW violated this provision by failing to establish standards for the timely provision of dental services, which has allegedly resulted in a delay of receipt of services.

The reasonable promptness provision was the precise provision at issue in *Bruggeman.* For the same reasons as noted *supra* Part I.D.1, we rule as a matter of law that the reasonable promptness provision does not afford plaintiffs the relief they seek because the provision requires the Commonwealth to provide timely medical assistance, i.e., financial assistance, and does not require the provision of actual services.

### 3. Count IV, Alleged Violation of 42 U.S.C. § 1396a(a)(30)(A)

■ Section 1396a(a)(30)(A), the equal access provision, mandates that the Commonwealth must assure that payments for care and services are "consistent with efficiency, economy, and quality of care and are sufficient enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area[.]" 42 U.S.C. § 1396a(a)(30)(A); *see* 42 C.F.R.

§ 447.204 ("The agency's payments must be sufficient to enlist enough providers so that services under the plan are available to recipients at least to the extent that those services are available to the general population.")

■ Procedurally, a state must consider efficiency, economy, and quality of care in establishing reimbursement rates. *See Minnesota HomeCare Ass'n, Inc. v. Gomez,* 108 F.3d 917, 918 (8th Cir.1997); *Methodist Hosps.,* 91 F.3d 1026, 1031 (7th Cir.1996); *Arkansas Med. Soc'y,* 6 F.3d at 530. Substantively, a state must ensure that its state plan incorporates adequate reimbursement rates to enlist a sufficient number of dentists to assure that dental care is available to MA recipients to the same extent and quality of care as dental care available to the general population in certain geographic areas. *See Rite Aid,* 171 F.3d at 853. The equal access provision is results-oriented in that it does not require any particular process to follow when establishing rates. *See id.* So long as the Commonwealth considered the appropriate factors enunciated by Congress, the Commonwealth cannot be said to have acted arbitrarily and capriciously as a procedural matter. *See id.* at 853–54.

Plaintiffs only raise a substantive challenge, in that they do not argue that the Commonwealth failed to consider "efficiency, economy, and quality of care," but rather argue that the Commonwealth failed to ensure that the MA program includes adequate reimbursement rates to enlist a sufficient number of dentists to assure that dental care is available to MA recipients to the same extent as dental care is available to the general population. In effect, plaintiffs challenge "the substantive impact or results of the [Commonwealth's] rates as failing to comply with Section 30(A)." *Id.* at 850 (citing *Minnesota HomeCare Ass'n,* 108 F.3d at 918–19 (concurring opinion));

*see New Jersey Hosp., Ass'n v. Waldman,* 73 F.3d 509, 514 (3d Cir.1995) (reviewing substantive compliance with other reimbursement provisions of Title XIX).

■ DPW correctly argues that to determine whether the Commonwealth has violated § 1396a(a)(30)(A), plaintiffs must first present evidence defining the appropriate geographic areas to consider. and then plaintiffs must present evidence to permit a comparison of the access to services enjoyed by MA recipients to the access to services enjoyed by the general population in the discrete geographic areas at issue. *See, e.g., Evergreen,* 235 F.3d at 931, 933–34; *American Soc'y of Consultant Pharmacists v. Garner,* 180 F.Supp.2d 953, 973 (N.D.Ill.2001); *Methodist Hosps.,* 91 F.3d at 1028–29. When making their comparison of access, plaintiffs may demonstrate unequal access through a variety of indicators, such as: (1) the level of reimbursement to participating dentists in the market and the costs of providing such services; (2) the level of dentist participation in the MA program; (3) whether there are reports that recipients are having difficulty obtaining care; (4) whether the rate at which MA recipients utilize dental services is lower than the rates at which the generally insured population uses those services; and (5) whether DPW agents have admitted that reimbursement rates are inadequate. *See Clark v. Kizer,* 758 F.Supp. 572, 576 (E.D.Cal.1990), *aff'd in relevant part sub nom., Clark v. Coye,* 967 F.2d 585 (9th Cir.1992). Other factors may also be relevant, but these factors capture the essence of the inquiry.

DPW claims that plaintiffs fail to present evidence of relevant geographic areas, of the services provided in those areas, and of the access to services enjoyed by MA recipients compared to that enjoyed by the general population in those areas. DPW also argues that, besides insufficient data from pertinent geographical areas, application of the five *Clark* factors illustrate DPW's compliance with the equal access provision.

The first question, therefore, is whether plaintiffs have presented sufficient evidence as to the access to services enjoyed by the general population in discrete geographic areas. Many courts have grappled with how to define the appropriate "geographic area" and the "general population." At least one court has held that the "geographic area" requirement is too vague or amorphous to be enforced at all. *See Methodist Hosps., Inc. v. Indiana Family & Soc. Servs. Admin.,* 860 F.Supp. 1309, 1332–33 (N.D.Ind.1994). Other courts cite the lack of evidence from discrete geographic areas, such as from counties or multi-county regions, as reason to deny equal access claims. *See Evergreen,* 235 F.3d at 933–34; *American Soc'y of Consultant Pharmacists,* 180 F.Supp.2d at 967.

■ Fortunately, legislative history is illuminating:

The Committee bill clarifies that the equal access test is to be applied in relation to the supply of providers in a geographic area. Thus, if a particular geographic area within a State has a smaller number of physicians per thousand insured population than other parts of the State, or than the State as a whole, the Medicaid payments would have to be at a level that ensures that Medicaid beneficiaries in that area have at least the same access to physicians as the rest of the insured population in that area. The Committee bill would not require that Medicaid payment levels be high enough to induce physicians to relocate into this area.

The Committee expects that the Secretary, in determining whether services are available to Medicaid beneficiaries at least to the extent that services are available to the general population, will compare the access of beneficiaries to the access of other individuals in the same geographic area with private or public insurance coverage (whether in the form of indemnity, service, or prepaid benefits). It is obvious that Medicaid beneficiaries are likely to have better access to care than individuals without insurance coverage and without the ability to pay for services directly. The question which the Secretary must ask is whether Medicaid beneficiaries have access to provider services that is at least as great as that of others in the area who have third party coverage.

H.R.Rep. No. 101–247, at 390–91, *reprinted in* 1989 U.S.C.C.A.N. 1906, 2116–17. The legislative history clarifies that the "general population" includes non-MA recipients in the geographic area who have public or private insurance coverage. *Id.* Although "geographic area" is not precisely defined, the legislative history suggests that "particular" geographic areas within a state should be considered, *see id.,* which implies that regional geographic areas within a state, rather than the state as a whole, should be the proper focus of an equal access challenge. Thus, the court finds that counties, or the multi-county services zones established by DPW, are the pertinent geographic areas to consider for plaintiffs' equal access challenge.

Presaging the court's finding that counties or multi-county regions are the pertinent geographic areas, DPW asserts that plaintiffs present no evidence as to the level of access enjoyed by individuals with private or public insurance coverage in discrete geographic areas. A review of the record reveals that plaintiffs do not present precise data in this respect. The court, however, remains skeptical as to how plaintiffs would even obtain such data. The difficulty in tracking the number of individuals with private or public insurance (versus uninsured individuals) in proportion to the number of dentists servicing discrete geographic areas would require widespread polling of those individuals, or would require a painstaking scouring of countless dentists' records. Both alternatives present high, if not insurmountable, hurdles.

Regardless, plaintiffs present an array of data showing the total number of dentists per county and the total number of dentists per county enrolled in the MA program. (*See* Pl.'s Exs., Rec. Doc. No. 73, Exs. 8–10.) Plaintiffs' data show the difference between the total number of dentists per county listed as participating in the MA program, versus the number of dentists listed as enrolled but who no longer accept MA patients, revealing the extent to which the enrolled dentists lists are outdated. (*See id.,* Exs. 45–46.) Plaintiffs also offer the expert report of James J. Crall, D.D.S., Sc.D., in which Crall synthesizes the various data and opines that MA recipients do not enjoy access to dental services equal to that enjoyed by the general population. (*See id.,* Ex. 40 at 11–14, 20–27.)

Aside from arguing that plaintiffs misrepresent or misinterpret the data, DPW also offers the expert report of Catherine Sreckovich, a health care policy consultant, in response to Crall's report. In her report, Sreckovich disagrees with Dr. Crall and instead concludes, for a variety of reasons, that there is no violation of the equal access provision. (*See. e.g.,* Def.'s Exs., Rec. Doc. No. 81, Ex. 1 at 21–35.)

The difference of opinion between Dr. Crall and Sreckovich alone creates a dispute as to material facts from which a

reasonable fact-finder could find for either party. Plaintiffs undoubtedly filed their motion to strike portions of Sreckovich's report to avert this factual dispute in the hope of vitiating DPW's support for its summary judgment motion. Yet, as discussed *infra* Part II, the court will deny plaintiffs' motion to strike. We will therefore deny summary judgment for either plaintiffs or DPW as to whether plaintiffs have adduced sufficient evidence to permit a comparison between the level of access to dental care and services enjoyed by MA recipients to the level of access enjoyed by the general population in the pertinent geographic areas. As a result, the corollary question of whether DPW's reimbursement rates are adequate to ensure equal access in the pertinent geographic areas (determinable via application of the *Clark* factors), remains outstanding as well.

### 4. Count V, Alleged Violations of the EPSDT Provisions

Plaintiffs' Count V rests on the medical assistance provision, § 1396a(a)(10)(A), to the extent it requires the Commonwealth's MA program to make medical assistance available to eligible individuals under 21 years of age in the form of early and periodic screening, diagnostic, and treatment (EPSDT) services. *See* 42 U.S.C. § 1396d(a)(xiii)(4)(B). Count V also rests on § 1396a(a)(43), under which the Commonwealth's plan must provide for informing all eligible individuals under 21 years of age of the availability of EPSDT services. 42 U.S.C. § 1396a(a)(43)(A). Additionally, the Commonwealth's "plan for medical assistance must . . . provide for . . . providing[,] or arranging for the provision of[,] such screening services in all cases where they are requested." 42 U.S.C. §§ 1396a(a), (a)(43)(B). Certain dental services fall under the umbrella of EPSDT

services. *See* 42 U.S.C. § 1396d(r)(1) & (3).

Plaintiffs argue that the Commonwealth violated the pertinent EPSDT provisions by failing to provide dental care to youngsters, and by failing to comply with the timeliness standards established in various EPSDT provisions. (*See* Rec. Doc. No. 71, at 57.)

■ Initially, plaintiffs' Count V fails as a matter of law to the extent that the medical assistance provision provides full or partial payment for EPSDT services because, as discussed *supra* Part I.D.1, the medical assistance provision speaks in terms of financial assistance, not medical services, so plaintiffs cannot claim that the Commonwealth failed to provide actual EPSDT services under § 1396a(a)(10)(A).

■ Yet, plaintiffs' Count V remains viable to the extent that it relies on § 1396a(a)(43). Unlike § 1396a(a)(10)(A), § 1396a(a)(43) requires DPW to play a more direct role in services provision. Section 1396a(a)(43)(A) mandates that the Commonwealth's MA program "must" provide for informing eligible individuals of EPSDT services. Moreover, the Commonwealth's "plan for medical assistance must . . . provide for . . . providing[,] or arranging for the provision of[,] such screening services in all cases where they are requested." 42 U.S.C. §§ 1396a(a), (a)(43)(B). In addition, the Commonwealth "must set standards for the timely provision of EPSDT services which meet reasonable standards of medical and dental practice" after consultation with professional organizations and "must employ processes to ensure timely initiation of treatment, if required, generally within an outer limit of 6 months after the request for screening services." 42 C.F.R. § 441.56(e). Clearly, the Commonwealth's obligations with respect to EPSDT services require more proactive steps, such as

actual provision of services, than other statutory provisions previously discussed in this opinion. *See Memisovski,* 2004 WL 1878332, at *50.

Plaintiffs' exact argument is that the Commonwealth is failing to employ processes to assure the timely provision of EPSDT services. Plaintiffs also claim that the Commonwealth has failed to consult with appropriate dental organizations in order to establish timeliness standards for the timely provision of initial dental treatment, an EPSDT service. *See* 42 U.S.C. § 1396d(r)(3).

 Citing *Frazar v. Gilbert,* 300 F.3d 530, 544 (5th Cir.2002), a pre-*Gonzaga University* case, DPW counters that perfect compliance with the EPSDT provisions is not required. DPW argues that § 441.56(e) speaks only of initial treatment, and that § 441.56(e) already provides an outer limit of six months for treatment after a request for screening services is made, so no further timeliness standards are necessary.

We disagree with DPW's interpretation of § 441.56(e). "EPSDT services," both by its own acronym (T for treatment) and by definition, includes treatment. Section 441.56(e) does not distinguish diagnostics and screening from treatment. "Initial treatment" only refers to the first time an MA recipient is treated. Adding "initial" before "treatment" in no way precludes subsequent treatment from EPSDT coverage.

Also, the six month outer limit for initiation of treatment does not supplant the need for additional timeliness standards. Regardless of when treatment is first initiated after a request is made, the Commonwealth is obliged, e.g., to adopt a schedule for screening service that meets reasonable standards of medical and dental practice, and cannot rely on a generalized schedule that does not take into account prevailing standards from the dental profession. *See* 42 C.F.R. § 441.56(e).

Plaintiffs contend that DPW has no standards for timeliness beyond that time period for initial treatment mandated under 42 C.F.R. § 441.56(e), and that the Commonwealth does not monitor the initiation or provision of treatment. This, plaintiffs claim, shows DPW's noncompliance with the EPSDT provisions. In further support of their claim, plaintiffs stress that only about 21% of children eligible for MA received any dental services. (Rec. Doc. No. 90, at 42.)

DPW, in contrast, asserts that the Commonwealth timely provides periodic EPSDT services. DPW also contends that merely because certain class members may have never seen a dentist does not establish a violation of the EPSDT provisions because the Commonwealth must only provide services "when they are requested," *see* 42 U.S.C. § 1396a(43)(B), and plaintiffs allegedly fail to show whether all individuals supposedly denied services actually requested services. Plaintiffs, though, do cite instances of persons seeking services and not receiving them. (*See* Rec. Doc. No. 71, at 61). DPW responds by citing evidence from which it can be inferred that the Commonwealth provides all EPSDT services in a timely fashion. (*See, e.g.,* Rec. Doc. No. 81, Ex. 2 at 56–57, Ex. 11.)

Plainly, genuine issues of material fact exist as to whether DPW is in compliance with the EPSDT provisions. Accordingly, the court will not grant summary judgment for either party as to this claim.

## II. Plaintiffs' Motion to Strike

 Plaintiffs move to strike portions of defense expert Catherine Sreckovich's report. Plaintiffs claim that Sreckovich's report: (1) is misleading in that it wrongly

states that DPW raised fees by 80% to 117%; (2) includes a "rate analysis" which is not based on any information supporting its validity; (3) needlessly reiterates inadmissible hearsay information favorable to DPW without taking into account contrary evidence; (4) relies on unsupported, irrelevant, or unreliable facts; and (5) contains expert opinions irrelevant to applicable legal standards. In essence, plaintiffs believe that Sreckovich's report is based on unreliable methodology or inadequate or inadmissible evidence.

Rule 702 of the Federal Rules of Evidence governs introduction of expert testimony. The rule states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. Rule Evid. 702. "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir.2003); *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Apparently, plaintiffs do not challenge Sreckovich's qualifications, but rather argue that her methodologies are unreliable and do not fit the issues in the case, i.e., are not relevant.

The court believes that these issues will best be resolved at trial rather than now in writing or following a *Daubert* hearing sometime prior to trial. As this case will be a bench trial, the court's "role as a gatekeeper pursuant to *Daubert* is arguably less essential." *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F.Supp.2d 584, 596 n. 10 (D.N.J.2002) (citing *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir.2000); *Volk v. United States*, 57 F.Supp.2d 888, 896 n. 5 (N.D.Cal.1999)). We remain cognizant that existing Third Circuit precedent does not indicate whether a district court's obligations to hold a *Daubert* hearing differ for bench trials. *See Chase Manhattan Mortg. Corp. v. Advanta Corp.*, No. Civ. A. 01–507(KAJ), 2004 WL 422681, at *9–10 (D.Del. Mar. 4, 2004). Yet, like the *Chase Manhattan* court, we recognize that existing Third Circuit case law does not indicate whether a decision to exclude expert testimony must be decided prior or subsequent to the bench trial. *Id.* at *9.

Consequently, we conclude that, in the absence of prohibition or direction from the Third Circuit, reliability and relevancy challenges to an experts' opinions may be considered during a bench trial. *See id.* Indeed, "[v]igorous cross-examination [and] presentation of contrary evidence" will provide the best means of attacking Sreckovich's report, *see Daubert*, 509 U.S. at 595, 113 S.Ct. 2786, as opposed to the court's conducting a line-by-line analysis of the report now. If the court examined the report now as plaintiffs urge, the court's determinations regarding the veracity, reliability, or weight of isolated statements in the report would be without the benefit of the context to be provided by other evidence, the context in which the report as a whole must be considered.

Accordingly, the court will take plaintiffs' objections to Sreckovich's report into consideration during the bench trial to best determine the overlapping weight and admissibility issues contemporaneously, as

other courts have done. *See, e.g., Astra Aktiebolag v. Andrx Pharm., Inc.,* 222 F.Supp.2d 423, 486 (S.D.N.Y.2002); *Berry v. School Dist., of City of Benton Harbor,* 195 F.Supp.2d 971, 977 n. 3 (W.D.Mich. 2002); *Ekotek Site PRP Comm. v. Self,* 1 F.Supp.2d 1282, 1296 n. 5 (D.Utah 1998).

We do, however, make some preliminary observations regarding Sreckovich's report. First, Sreckovich intersperses her opinions throughout her report, such as by commenting that "[a]ccess and utilization do not increase proportionally to increases in reimbursement." (Rec. Doc. No. 81, Ex. 1 at 29.) Sreckovich also states that "Pennsylvania has managed to maintain adequate levels of access to dental providers for the Medicaid population." (*Id.* at 30.) These examples are plainly relevant to plaintiffs' underlying equal access challenge.

Second, we also believe that no dire harm comes from facts obtained from interviews with DPW officials. Although plaintiffs may see this as a self-serving way of re-stating previous information from defendant, the inescapable truth is that DPW is responsible for implementation of the plan and must necessarily be a source of information. We note that significant non-judicial uses (the eighth *Daubert* factor), of information from DPW officials abound, such as maintaining data on, at a minimum, reimbursement and services delivery for use at both the state and federal level. Also, Sreckovich can rely on information that may not be admissible as evidence, *see* Rule 703, and as defendant points out, documentary information is independently admissible under Federal Rule of Evidence 803(8). Plaintiffs are free to undermine the weight and credibility of such information at trial.

### CONCLUSION:

For the above reasons, the court will deny plaintiffs' motion for summary judg-

ment and will grant DPW's motion for summary judgment in part. Summary judgment will be entered in favor of DPW as to plaintiffs' Counts I and II. Count III will be dismissed, given plaintiffs' failure to pursue that claim. The following issues remain for trial:

1. Plaintiffs' Count IV based on the equal access provision, § 1396a(a)(30)(A), particularly:

 A. whether plaintiffs have adduced sufficient evidence to compare the dental care and services available to plaintiffs to that available to the general population (i.e., insured individuals) in the pertinent geographic areas; and if so,

 B. whether the Commonwealth's reimbursement rates fail to ensure that plaintiffs and class members in the pertinent geographic areas have at least the same access to dental care and services as the rest of the general population in those areas.

2. Plaintiffs' Count V, based on the EPSDT services provisions, particularly, whether the Commonwealth has failed to employ processes to assure the timely provision of those services required to be provided.

Although sensitive to the importance of a timely outcome in this case, the complexity of the remaining issues warrants the court placing the case on the January 2005 trial list to afford the parties adequate time to prepare. An appropriate order follows.

### ORDER

For the reasons set forth in the accompanying memorandum,

**IT IS ORDERED THAT:**

1. Plaintiffs' motion for partial summary judgment (Rec.Doc. No. 70), is denied.

2. Defendant's motion for summary judgment (Rec.Doc. No. 75), is granted in part and denied in part as follows:

a. Summary judgment is entered in favor of defendant and against plaintiffs with respect to plaintiffs' Counts I & II, and to Count IV to the extent it rests on 42 U.S.C. §§ 1396a(a)(8), (a)(10)(A). The clerk is directed to defer entry of final judgment until there is a final disposition of the entire case.

b. Defendant's motion is denied in all other respects.

3. Plaintiffs' Count III is dismissed without prejudice.

4. Plaintiffs' motion to strike (Rec.Doc. No. 87), is denied.

5. The case will be placed on the January 2005 trial list, and will be tried non-jury, as there has been no jury trial demand.

6. A final pretrial conference will be held on December 1, 2004 at a time to be announced. An attempt will be made at that time to agree on a trial date.

7. Motions in limine must be filed no later than November 12, 2004, accompanied by supporting briefs. Opposing briefs must be filed on or before November 30, 2004. No reply briefs will be permitted.